**Edwin RODRIGUEZ–PEREZ, Plaintiff**

v.

**CARIBBEAN MEDICAL CENTER, Pueblo International, Inc., A, B, C and D Insurance Companies, X, Y, Z Corporations, Jon Doe and Richard Roe, Defendants**

**No. CIV. 04–1045CCC.**

United States District Court, D. Puerto Rico.

Jan. 24, 2005.

Jean Philip Gautier, Esq., San Juan, PR, for Plaintiff.

Juan Antonio Pedrero–Lozada, Esq., Rafael O. Baella–Ors, Esq., Ramonita Dieppa–González, Esq., Alessandra María Rosa–Tirado, Esq., Juan M. Masini–Soler, Esq., San Juan, PR, for Defendants.

**ORDER**

CEREZO, District Judge.

This action, brought pursuant to the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, is before us on defendant Caribbean Medical Center's (CMC) Motion for Summary Judgment (**docket entry 23**). Defendant cites the statutory definition of "hospital" 42 U.S.C. § 1395x(e) which, in pertinent part, defines hospital as an institution which "(1) is primarily engaged in providing, by or under the supervision of physicians, to inpatients...." (our emphasis), as well as arguing that it was not a Medicare provider on the date plaintiff came to its facility. CMC therefore concludes that it is not a participating hospital for purposes of EMTALA. Defendant has provided documentation which demonstrates that it is an Outpatient Surgery Center with an emergency room.

Plaintiff, in his opposition, does not address the definition of "hospital" and cites only generally to 42 U.S.C. § 1395cc, the section dealing with provider agreements. He also continues to allege, without any

evidentiary support, that defendant is a hospital, that it is a Medicaid provider, and as such, is responsible for compliance with EMTALA.

On December 6, 2004 we granted plaintiff time to supplement his opposition with documentary evidence that (1)plaintiff is a Medicare provider and (2) that it is a participating entity for purposes of EMTALA.

In response to our order, plaintiff filed a Supplementary Motion in Support of its Opposition (**docket entry 36**) which included a copy of Health Insurance Contract No. 03–020–E for the North East Health Region between Puerto Rico Health Insurance Administration and MCS Health Management Options, dated July 1, 2004. Inasmuch as the facts of this case occurred on July 15, 2003, almost a year before this contract was signed, it is unclear to what extent it has been amended. Plaintiff has also failed to direct us to what sections of this 121 page document support his contentions in the case at bar. Plaintiff asks that the Court order CMC to provide a copy of its provider agreement because he has been unable to obtain one by other means. We decline to do so for the reasons stated below.

EMTALA was enacted by Congress in 1986 in the face of the increasing number of reports that hospital emergency rooms were refusing to accept or treat patients with emergency conditions if the patient did not have medical insurance. 3 U.S.C.C.A.N. 1986 p. 420.

The medical screening requirement in 42 U.S.C. § 1395x(e) states in pertinent part:

In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide an appropriate medical screening examination within the capabilities of the hospital's emergency department....

(Our emphasis.)

Plaintiff has once again failed to address CMC's contention that it is not a "hospital." The licensing documents provided by defendant CMC are issued to Caribbean Medical Center Outpatient Surgery Center.[1] Inasmuch as a "hospital," as defined by the statute, is an entity primarily engaged in providing services to **inpatients**, we find it immaterial whether or not CMC had a contract to provide services to Medicaid patients; it is not covered by EMTALA because it is not a hospital. The language of the law is plain and unambiguous. Hospitals are primarily charged with inpatient services. The entire focus of § 1395dd is on the hospital. Section (a) uses the phrase ... the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department.... If Congress wanted to extend EMTALA's reach to other facilities, it could have just specified "emergency rooms." Additionally, the legislative history reveals that Congress, at the time the law was passed, was aware of emergency room facilities outside of the hospital setting. A statement submitted by the American College of Emergency Physicians to the House Judiciary Committee on September 6, 1985 states:

There is also a decreasing emphasis upon the provision of inpatient hospital services generally. Alternative health care delivery systems such as ambulatory surgical centers, freestanding emergency facilities, and outpatient services

---

**1.** Although the certification is dated July 11, 2004, it lists the dates of effectiveness as July 1, 2003 through June 30, 2005, which encompasses the date of the facts of this case.

of every sort have served to reduce hospital revenues and further limit the resources available for treatment of the poor.

(Our emphasis.) 3 U.S.C.C.A.N. 1986 p. 436.

All but one of the cases cited by plaintiff refer to hospital emergency rooms. The exception is the case of *Rodriguez v. American International Insurance Company of Puerto Rico,* 263 F.Supp.2d 297 (D.Puerto Rico 2003), which plaintiff claims supports the inclusion of emergency rooms not affiliated with hospitals, *i.e.* Centers of Diagnosis and Treatment[2] (CDT) under EMTALA.

Judge Pieras, in his opinion in that case, states that CDT's would ordinarily be considered a clinic but for the presence of its round-the-clock emergency room. He further considered a directive issued in 1999 in *Gonzalo v. González, Director of Medicare,*[3] which stated that "for purposes of Medicare, CDTs would not be classified as emergency rooms unless they are attached or hospital based." *Id.* at p. 301. The Court distinguished the directive, however, determining that it applies to the processing of Medicare payments and has nothing to do with the EMTALA obligations of "a 24–hour emergency room operating in a CDT." *Id.* The only 24–hour requirement contained in the hospital definition is under subsection 1395x(e)(5) which states that the institution provides 24–house nursing service. Further along at subsection 1395x (e), it states that "[t]he term 'hospital' also includes a *facility of fifty beds or less....* " (Our emphasis).

The opinion does raise one point that we must consider:

... [T]he Court cannot fathom why the Corozal CDT would post EMTALA re-

quirements when those requirements clearly only apply to "hospitals" on the contrary, the Court finds the fact that these pictures are in plain view inside the CDT to be indicative of either of two things: that the CDT can be considered a hospital for purposed of EMTALA or, in the alternative, that EMTALA applies to other health facilities that offer around the clock emergency room services but which are not strictly a "hospital" within the meaning of the statute. Either interpretation is valid.

*Id.,* at 301–302. The fact that the Corozal CDT posted the EMTALA requirements in its emergency room could represent a voluntary submission to the terms of that law. The case before us, however, is distinguishable in that there is no allegation that the EMTALA requirements are posted at the Caribbean Medical Center.

The examples given as amendments to the statute "to include other health care providers...." *Id.,* at 299, are *"hospitals* located in rural areas" and "off campus *hospital* outpatient departments." (Our emphasis.) Moreover, the amendments refer to 42 U.S.C. § 1395cc, which delineates the agreements with providers of services. It is clear that definition of "hospital" used in EMTALA is the common one; we hesitate to expand it to all other health entities merely by the posting, for unknown reasons, of the EMTALA regulations at one CDT.

We can think of many reasons why covered emergency rooms were limited to only those connected with or part of hospitals. For example, Section 1395dd(c) provides that "If an individual at a hospital has an emergency medical condition which has not been stabilized ... the hospital may not transfer the individual ..." and

2. In Spanish, *Centros de Diagnóstico y Tratamiento*

3. The directive could not be located in any of our research materials.

**22**

list four exceptions, none of which are applicable here. The statute does not distinguish between individuals arriving through the emergency room or those admitted to the hospital. While this section would not be problematic in the case at bar, where the injury in question is a sprained or broken wrist, the arrival of a medical emergency, as defined by the statute,[4] at a non-hospital facility could require an immediate transfer to a hospital for treatment not available in the emergency room. The transfer of an unstabilized patient in this circumstance would be a violation of the restrictions on transfers.

For the above-stated reasons, we decline to follow the decision in *Rodriguez*. We find that the Caribbean Medical Center Outpatient Surgery Center is not a hospital as defined in the statute for purposes of EMTALA. The Motion for Summary Judgment (**docket entry 23**) is GRANTED. Because the tort claim against co-defendant Pueblo International is based upon Puerto Rico law, and there being no other basis for federal jurisdiction, the claim against Pueblo International is DISMISSED, without prejudice to being raised in the Puerto Rico Courts. The federal claim under EMTALA is DISMISSED, with prejudice. The state law claim is DISMISSED, without prejudice.

SO ORDERED.

### JUDGMENT

For the reasons stated in our Order of this same date, the federal claim under EMTALA is DISMISSED, with prejudice.

The state law claims are DISMISSED, without prejudice.

SO ORDERED AND ADJUDGED.

---

4. § 1395dd(e)(1), in pertinent part, defines the term "emergency medical condition as

    (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -

    (1) placing the health of the individual...in serious jeopardy,

    (2) serious impairment to bodily functions,' or

    (3) serious dysfunction of any bodily organ or part."